Good morning. May it please the court, my name is Terence Kellogg. I represent Brian Jones. I wish to reserve four minutes if I might. This case is essentially a vouching case. It's not a case of waiver and it's not a case of failure to object at the time of trial, as much as the government would like to rely upon that. Not only is it a vouching case, but to fairly assess the prejudice to Jones from the government's vouching for what it considered and argued to the jury was Denise Medina's truth. And that phrase was used repeatedly by the government in closing argument. The government's closing argument... But there was no effort to comment on which one is believable. I don't see the problem with that, quite frankly. The problem is the way in which the comment was made, Your Honor. The comment was made by placing the governance, the office of the United States Attorney as a personal opinion. Just because the statement was not, in one instance it was, but because it did not... Let me ask you this. If the prosecutor had said believable instead of truth, would that make any difference? I mean, as I understood it, counsel was arguing to the jury that one version of facts given by the witness was correct and the other was incorrect. And whether he calls it truth or believable makes little difference. It's not that the government is putting, the prosecutor's putting his own credibility on the line as I see it. Well, I would urge you to reconsider that position. I'm quoting from the government's answering brief at page 75, where they, I'm quoting United States v. Preston, a case that we rely upon. It is improper for a prosecutor to characterize a witness's testimony as, quote, the truth. Then they cite to Preston, they continue. But isn't it different when you have two conflicting, I mean, the versions of events are irreconcilable. So this is a different situation than the prosecutor just coming in and saying one side is true and the other isn't. He has to say one or the other. Well, how can they say that if there weren't two sides? Well, your client gave both sides. Pardon me? Your client gave both sides. I mean, your client gave both statements. That's what my colleague is trying to present to you. This is quite a different thing than coming in and saying everything we presented is true and everything they presented is false. That may be where you're going to go. But what he's suggesting to you is in this instance, Medina gave one statement one time and one another, and one did not agree with another. So all he was trying to do is juxtapose the two. Well, and it's also true that you didn't, your side didn't even object to the first statement. Isn't that true? I believe that there were two objections before the third and final objection made after the last statement, but nothing on the first statement. First statement came in, there was no objection regarding the December 25th, 2014 incident. In closing argument, I believe there was. Our point is that we're asking the court to look at the totality. What happened after the second statement? The district court admonished the jury and cured any problem. I believe that that was the third. And it was in reference to not Ms. Medina's testimony, but rather that of Mr. Williams, where the prosecution said he's not, I don't think he's the kind of guy who can figure out what he's going to do next week, let alone plan something as intricate as manipulating Denise Medina's testimony. The court initially overruled the objection and then reversed itself because of the use of the I. And it's that. In addition to the curative instruction that the judge gave during the closing argument, did the judge also, as the record bear out, the judge also gave the instruction at the conclusion of the trial that you're not to, that what the attorneys say doesn't count? Your Honor, I, I'm not making my point. And my point is the way in which this was presented by the government, starting not just with closing objectionable, clearly objectionable representations of the government counsel's belief as to which version of events was true, but starting off with calling Ms. Medina as a witness, the first thing that the government does is bring out that her lawyer's present, that she's got a grant of immunity, that anything that she says doesn't matter. And it was because the government anticipated needing to rely upon her prior grand jury testimony. This case. Okay. So what, so what, so what's the problem? What's the legal principle at, at, at issue here? I think that the legal principle at issue here is the, is the fairness of trial and the government putting its position, its authority, inferring that they have more than they're able to show during the course of the case, with which they take the position that the truth of, of the two differing versions is the one that was presented to the grand jury exclusive of anything else. And. But isn't, isn't, isn't that, isn't that a fair, isn't that a fair comparison for the government to present and then allow the jury to decide which, which of these, which of these two inconsistent statements is true if either of them is true? Up to a point. And that was the point that was made, the It's not improper that the, the quote that I was referring to in the government's answering brief continues in Neko Chia by saying, it's not improper to argue witness was telling the truth when that is a permissible inference. So that's the difference between saying something is the truth and arguing that a witness was telling the truth. And it may be a subtle distinction, but it is incredibly important. Because when a government prosecutor is talking to 12 people and saying, this is the way it is, this is the truth, this is Denise's truth, repeatedly, after setting it up. Yeah. But, but counsel, I'm, I'm looking at the objections on, on page, it looks like excerpt records 41 and 42. I'm just not sure I see the vouching there. These are the reference, these are the objections to Denise's truth. Well, the, the objection to the vouching is because of the way in which it was stated. The tone, the inflection, the things that, that aren't apparent of record, that's why the objections were made. Because it was. Now, we're, you're going to have a very difficult time with us. I already have. If, if, if, if, if you're depending on us to figure out what the voice inflection is. Well, we're reading this on a cold record, and for that, we are going to have to defer to the district judge. So if you, if you want to argue that there was voice inflection here that is somehow relevant to deciding whether the government was vouching or not, we are, this court is now at the mercy of the district judge on that one. The district judge has it all over us on that one. I can see that. We're not president, and all we can do is just take your version of that, but you had an opportunity to object, which you did, and, and the district judge overruled it. But it wasn't just closing argument. It was throughout the totality of the case. It was, it was the fact that she was granted immunity. It was the fact that instead of testifying. Granting immunity is not vouching. It is not, Your Honor. But it's denigrating the oath. It's, it's saying you, and in fact, that was the question early on, was so you can say anything that you want here. This is a free pass. Why should we believe anything that you say here? But, but see, I don't understand that because at trial, her, her, her testimony was exculpatory, wasn't it? It was the prior statement that you're complaining about, not the one at trial. Right. And it was a prior statement that the, that the government repeatedly, adamantly, and I appreciate Judge Bivey, Bivey's comments that you can't talk tonal inflection, but it was, it was that passion. It was that imprimatur of the government's position that is our concern, that denied a fair trial, and it's not just a phrase used in the, in the middle of closing argument, it was replete throughout the record, and it exactly. My comment, my question really went to your argument that somehow immunity had something to do with it because she came in and gave an exculpatory version of the That was, that was the, I guess what the prosecutor would say was, was not the truth, and my point was the immunity enabled that argument to go further by saying it might as well have been on the street as opposed to in court under oath. Okay. You have other issues you might want to take up? Well, yes. Do we have all you want to say about that? Well. I mean, all I'm trying to do is get you to other issues. If this is the one you really want to talk about, well, then you can sit down and give it to us on rebuttal, I guess. I would say, thank you. I would say that, we realize that we're asking this court to look at, this from a standpoint of structural error, that's what Preston says, is that when you have a multitude of errors, this compounded the rulings, evidentiary rulings on, for instance, the excited utterance being admitted in balance at the prior conviction of Mr. Ramos's credibility as to the brandishing of the firearm was not permitted to be gone into. I know that the court's aware of these things because they've been briefed and presented, but that's the difference between focusing with a microscope on limited statements, as opposed to the cumulative effect of errors to such a degree, and we admit we're pushing the envelope, but we submit that Mr. Ramos only constituted structural error. Did you appeal a cumulative error? Well, we're saying that there was cumulative error replete throughout the trial. Now you're saying it? No, we said it in the brief. Is that one of the issues in your brief? Yes, Your Honor. Okay. Yes. That's the position that we've taken. That's the position of Preston, and we're saying that it exacerbated all of the other evidentiary rulings. The government filed a supplemental authority, Kutsuwane, about the use under evidence rule 8034 of medical testimony for purposes of identification. I found that case interesting because it points out that, first of all, it limited the scope of being able to introduce evidence of identification under the medical testimony exception for purposes of identity, but limited that, said that so far it's only been in cases of child sexual assault, and Kutsuwane, the victim, was an 11-year-old developmentally disabled individual, so we submit that that's consistent. But here we have forensic nurse Eben, who not only is interviewing for purposes of providing testimony later on, Denise Medina is to the nature and extent of her injuries, but is doing so in the presence of her former husband, Anthony Williams, who's there the entire time, when he is the one who not only was not able to be cross-examined as to prior tribal convictions for domestic violence and orders of protection obtained by Ms. Medina, but limited to being asked by the court, by defense counsel, whether or not he'd ever been physical with Ms. Medina, and when the answer was, no, can't remember that, that was the end of it, so... But as I understand it, let's just take Eben. Yes. Let's take it Eben. As I understand it, Eben is a forensic nurse. Her purpose is to... Testify that she is the nurse who primarily treats people who come to the emergency room and say they're injured by another person. You're absolutely right, Your Honor. And as I understand it, well, I looked and I could find no evidence in the record that makes Eben a part of law enforcement. So I said to myself, since Eben testifies that knowing the identity of the attacker and the contours of the incident are important for treating Medina, if she's a forensic, if Eben is a forensic nurse and she's the nurse who primarily treats those that come to the emergency room and say they're injured and there's no evidence to the contrary in the record, on abuse of discretion standard, how do I throw that out? Well, that's one of the reasons that we're saying that all of these issues of error are exacerbated by the cumulative effect of the court's rulings throughout. Let's just go to Lata. Lata testifies Medina sought treatment for increased anxiety and depression related to a home invasion situation where Jones had broken into their home on Christmas and held her and her husband at gunpoint. If a patient seeking treatment for anxiety from a specific incident seems to mean one would not want to know what happened and what was there at the time. And, and again, I'm having trouble why that one would say one should exclude Lata's record. Lata and Eben are different instances. I know they are. That's why I put Eben first and Lata second. Yeah, but you characterized Eben as being a treating practitioner and she was not, her focus is limited to taking photographs, witnessing injuries and testifying in court. Didn't Eben testify that she was the nurse who primarily treats people who come into the emergency room and say they're injured by another person? Doesn't she testify to that? I don't think she testifies about treatment. She says that she sees people and then refers them for treatment. Look at SER 300 and there's where I got that. I'm not going to argue with you, Your Honor. All right. All right. Um, I wish to reserve. Well, you're over, you're well over your time at this point. I, but I will allow you some time. Thank you. Good morning, Your Honors. May it please the court. Michael Morgan for the United States. I'd like to just, before getting into the merits, just clear up, um, what I think is some confusion about cumulative error and structural error. Um, there was no structural error in this case. I mean, the only claim that was possibly structural was a confrontation clause claim, which aside from being unpreserved, just isn't a structural error. I understand the council is trying to argue that there were a bunch of mistakes that together were prejudicial. That's a claim of cumulative error. That's not a structural error. Um, and there's also a problem because council didn't actually raise a claim of cumulative error in their opening brief. They argued that the evidentiary questions together amounted to a cumulative error. They didn't argue that evident, the evidentiary questions, plus the vouching, purported vouching, plus other claims amounted to a cumulative error. So any of such claims waived. Um, getting to the merits, I guess I'll address the vouching claim first, because that seems to be the defense's primary point. The short answer is that in marshaling the evidence and arguing that the victims out of court statements were quote Denise's truth, all the prosecutor was doing was asking the jury to believe that those statements, as opposed to her recantations on the stand were believable. That is proper. You are allowed to argue that a witness was telling the truth. You're not allowed to say, I know that what she says is the truth in the objective world, because that usurps the jury's role, but that's not what happened here. All the prosecutor did was argue that this witness, when she was not in Mr. Jones's presence, testified or made statements that were believable. It was for the jury to determine which version of events to believe, but nothing about that amounts to vouching. With respect to the evidentiary questions, um, the statements to the nurses are plainly admissible under this Court's precedent. Um, Hall forecloses any argument on this point. But does the record bear out that, that, uh, Eben, uh, talked to, um, the victim in this case for purposes of diagnosis or treatment? It does, Your Honor. Um, Eben is essentially, not essentially, she is in fact a sane nurse. The same kind of nurse that was at issue in Kutzwana, uh, if I'm pronouncing that name, that name correctly. Um, but her, as she testified, she is called in any time a witness present or a victim presents to the emergency room, uh, where it looks like she's been, uh, the victim has been assaulted by another. And she takes the medical history, which is what she does. And she relays that as she's testified in this case to the treating physician assistant. So she's working like a nurse. She's taking the treatment history, which goes on to the treatment provider. And she made clear that, you know, that the treatment history she takes is relevant to the, to not only her treatment recommendations, but the, the treating physician's, uh, treatment recommendations. The record completely bears that out. Um, it likewise bears out that Lada, uh, similarly needed this information as formulating her, her treatment, uh, uh, recommendations. So the prerequisites for admission were, were plainly met on foundational basis. And in fact, that was never, that was never the complaint below. The complaint below was never that there was an insufficient foundation, i.e. that these were really treatment. The complaint below was that they just shouldn't come in. They're too prejudicial and they shouldn't, and statements of identity shouldn't count. That was the objection. The objection was never a foundational one. Um, with respect to the limitations of the cross-examination for, uh, uh, Mr. Ramos, the counsel has alluded to, this was a discretionary call for the district court. Um, the defense offered a specific reason why it wanted to bring in Mr. Ramos's past conviction, which wasn't just to impeach him generally. It was to aid this defense that somehow Mr. Ramos was lying about the fact that he didn't touch the gun a month and a half after the December assault takes place. Now, leaving aside that that has like zero relevance to the crime, it was a complete side issue. Whether or not he touched that gun or this other person touched that gun was completely irrelevant. And since that was the reason that the defense wanted to bring in that conviction, the district court acted well within its discretion in excluding it under 403. Um, similarly, with respect to, uh, Mr. Williams's past, uh, history of domestic violence, the court actually admitted the underlying facts. It allowed defense counsel to explore the underlying facts, which is what the defense asked for. The defense never sought to admit evidence of his convictions. So. If Mr. Williams, Mr. Mr. Williams, did Mr. Williams admit to the prior domestic violence? Uh, he admitted to one and then could not recall the other. Um, and on that latter point, uh, the district court, uh, did not allow the defense to follow up with, did you admit to this, which we concede in our brief he should, the court should have. Um. Certainly if, if, if Williams had denied the domestic violence, then you, then defense would have been permitted to bring the, the prior, the prior acts, the prior convictions. I submit that the answer to that question is yes. That, and that's why I said, I don't see how the government could, could refuse that if, if, if Williams has said, no, I've never touched her. And he had a conviction for domestic violence. I agree with that. And that's why I believe, um, well, the first instance, uh, he admitted, so that didn't really become a problem. The second incident, um, he said he couldn't recall. And that's why I, I, I, we did concede in our brief that the court should have allowed, um, him to further explore that issue with, did you admit to this previously, but on this record, that's just completely harmless for a couple of reasons. I mean, not just because of the overwhelming evidence of guilt, but also because of the fact that there was plenty of evidence in the record already of Williams's domestic violence history, most of it coming from Medina herself. So the, the evidentiary record for defense to make the argument it wanted to make was there, um, this little extra piece, it might've helped a little, but it certainly didn't amount to a reversible error. Um, unless the court, there's, there's many issues in the case, unless the court has questions with any other specific evidentiary points, I think I've covered what has been raised. I know that we have to have a question. Thank you. I'd ask you to confirm Mr. Kellogg. Thank you, Your Honor. William's admission of one incident was, uh, as I recall, uh, he did so to get out of jail, uh, he admitted, uh, uh, a charge in order to get out of jail. So, uh, the fact that what actually transpired in the history between he and, uh, Ms. Williams, uh, was not able to be brought out by the defense. Uh, as far as, uh, the government's reliance upon Perez-Sylvan, uh, saying that we did not raise any issues in our opening brief, uh, Perez-Sylvan is limited to a total failure in opening brief to raise an issue at all, which then sought to be argued. So we submit that it's not appropriate here or relevant here for purposes of, uh, addressing the issues. We can consider cumulative error. Pardon me? You think we can consider cumulative error? Absolutely. Even though it wasn't briefed separately. I, did you brief, did you brief it separately? Is it set out as a separate issue? Not in my opening brief and the reply brief. And, uh, I, it was more in the context of wanting the court to consider the totality of the issues presented. I did not use the term cumulative error in the opening brief, I believe. How about in the reply brief? Oh, absolutely. Absolutely. And I cited the precedent. I quoted why it is that when you have a multitude of errors, you have to, uh, apply a cumulative error standard. And, uh, moreover, it, it could be seen as, uh, more of a structural error, the standard, rather than the typical abuse of discretion, uh, review. Wait, what, what, I'm sorry, where does the structural error come from? The, the cumulative error is structural in the sense that it is so egregious. Well, uh, you're using structural, I think in a way that the court doesn't usually use that term. Structural error has a very, very precise term in, in criminal law that requires, uh, doesn't require showing a prejudice, requires us to, to reverse. So I don't think that's the sense in which you're using structural errors. I think cumulative error is probably a better term. Well, I wanted to use both because I want you to feel compelled to reverse, but I appreciate the education from the, from the best source possible. And I'm going to sit down now. Thank you. Thank you, Mr. Kellogg. Uh, United States versus Jones is, uh,
judges: Bybee, N.R. Smith, Antoon